IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THE DISABILITY RIGHTS COUNCIL OF GREATER WASHINGTON, et al, ) ) ) ) Plaintiffs, ) ) v. ) ) WASHINGTON HOSPITAL CENTER, ) ) Defendant. ) | Civil Action No. 03-CV-2434 (JR) |

## PLAINTIFFS' FIRST AMENDED COMPLAINT

Plaintiffs, by and through their undersigned attorneys, allege for their Complaint against the Defendant as follows, on knowledge as to themselves and their own actions and on information and belief as to all other matters except as indicated otherwise:

### INTRODUCTION

1. The individual Plaintiffs in this case have disabilities that require them to use wheelchairs for mobility. The Disability Rights Council of Greater Washington ("Disability Rights Council") is a nonprofit advocacy group with a direct interest in protecting the rights of disabled persons, including those who use a wheelchair for mobility. Washington Hospital Center, which is a subsidiary of the nonprofit corporation Medstar Health, Inc., owns and operates a hospital and a physician's office building. Various facilities and services at the hospital and physician's office building are inaccessible to persons with disabilities, in violation of the requirements of the Americans With Disabilities Act ("ADA") of 1990, 42 U.S.C. §§ 12101, et seq. (Supp. V. 1993), Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §§ 2-1401.01 et seq.

(2001). Plaintiffs hereby seek to enjoin Defendant from ongoing violations of federal and local laws enacted to protect the rights of persons with disabilities, and to recover damages for the denial of access to health facilities and services, which harmed and endangered their health, and which caused them to suffer humiliation, embarrassment and physical discomfort.

## PARTIES

2.  Dennis Christopher Butler, a resident of the District of Columbia, is an individual Plaintiff in this action. He has a physical impairment that substantially limits one or more of his major life activities, including walking. Mr. Butler uses a wheelchair for mobility. He has sought services at the Washington Hospital Center, and continues to and will continue to rely on the Washington Hospital Center for the provision of medical care.

3.  Rosemary Ciotti, a resident of Virginia, is an individual Plaintiff in this action. She has a physical impairment that substantially limits one or more of her major life activities, including walking. Ms. Ciotti uses a wheelchair for mobility. She has sought services at the Washington Hospital Center, and continues to and will continue to rely on the Washington Hospital Center for the provision of medical care.

4.  George Aguehounde, a resident of the District of Columbia, is an individual Plaintiff in this action. He has a physical impairment that substantially limits one or more of his major life activities, including walking. Mr. Aguehounde uses a wheelchair for mobility. He has sought services at the Washington Hospital Center, and continues to and will continue to rely on the Washington Hospital Center for the provision of medical care.

5.  Marsha Johnson, a resident of Maryland, is an individual Plaintiff in this action. She has a physical impairment that substantially limits one or more of her major life activities, including walking. Ms. Johnson uses a wheelchair for mobility. She has sought services at the Washington Hospital Center, and may require specialized care from the Washington Hospital Center in the future.

6.   The Disability Rights Council (collectively with the individual Plaintiffs referred to herein as "Plaintiffs") is a nonprofit corporation organized under the laws of the District of Columbia with its principal place of business at 11 Dupont Circle, N.W., Suite 400, Washington, D.C. 20036.  The Disability Rights Council's membership is composed of individuals who have a direct interest in protecting the rights of persons with disabilities.  Some of these members have physical disabilities.  The Disability Rights Council's principal goals are to eliminate discrimination on the basis of disability and to promote equal access to all goods, services, facilities, privileges, and advantages in all places of public accommodation for persons with disabilities.  These goals include ensuring that health care facilities and services are available and accessible to individuals with disabilities, so that they may receive the same quality of care as all other patients.  The Disability Rights Council pursues these goals through various means, including research, public education, counseling and conciliation.

7.   Defendant Washington Hospital Center ("WHC") is a subsidiary of Medstar Health, Inc., a nonprofit corporation, which is located at 5565 Sterrett Place, Columbia, MD 21044. WHC has its principal executive offices at 110 Irving Street, N.W., Washington, D.C. 20010, doing business in the greater Washington, D.C. area at the following locations: (a) Washington Hospital Center, 110 Irving Street, N.W., Washington, D.C., 20010; and (b) Washington Hospital Center Physician's Offices, 106 Irving Street, N.W., Washington, D.C. 20010.

### JURISDICTION AND VENUE

8.   This action is brought for injunctive relief and to recover damages for Defendant's clear and ongoing violations of the ADA, the regulations promulgated pursuant to the ADA, the Rehabilitation Act, the regulations promulgated pursuant to the Rehabilitation Act, and the DCHRA.  Jurisdiction for Plaintiffs' ADA and Rehabilitation Act claims is conferred on this court by 28 U.S.C. §§ 1331 and 1343, while jurisdiction for their DCHRA claim is conferred on this court by 28 U.S.C. §1367.

9.  Washington Hospital Center is registered to do business in the District of Columbia, has its principal place of business in the District of Columbia, and is thus subject to personal jurisdiction there.  Accordingly, venue in this judicial district is proper under 28 U.S.C. § 1391.

10. In accordance with Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury.

## GENERAL FACTUAL ALLEGATIONS

### I.      Dennis Christopher Butler

11. Plaintiff Dennis Christopher Butler is a resident of Washington, D.C., and has been quadriplegic for 18 years.  He has no control over his muscles from the neck down, and uses a power wheelchair for mobility.

12. Mr. Butler is a regular patient at Washington Hospital Center, and will continue to use WHC's services in the future.  On a monthly basis Mr. Butler visits, and will continue to visit, his urologist, Dr. Mitchell Edson, whose office is in the WHC Physician's Office building and who is associated with WHC.

13. After suffering a serious burn injury, Mr. Butler had to enter WHC in June 2002, where he stayed as an inpatient for approximately two weeks.  Once there, he encountered the following barriers of access to facilities and services:

### A.      Lack of Water

14. Mr. Butler regularly requires one glass of water per hour because he is prone to dehydration and urinary tract infections.  During the period of his 2002 hospitalization, his need for water was exacerbated because burn victims require extra water as part of the healing process.

15. Due to his disability, Mr. Butler requires special equipment or assistance in order to drink.  However, the WHC nurses and staff did not assist him in drinking water frequently

4

enough to meet Mr. Butler's hydration needs and they provided him with no means of drinking water independently.   Mr. Butler made repeated requests for a source of water that he could access himself, but the nurses and hospital staff did not make one available.

16. Mr. Butler's father and a friend eventually created an accessible source of water for him using a microphone stand and a water bottle from a bicycle.   This water bottle required refilling, as well as regular cleaning, due to Mr. Butler's heightened risk of urinary tract infections.

17. When Mr. Butler asked a nurse to clean the bottle and refill it when empty, she refused to do so, saying that she was too busy.   As a result, the water bottle was frequently dirty and empty.

18. Further, hospital staff would frequently move the water bottle stand out of Mr. Butler's reach, and consistently failed to leave it where Mr. Butler could access it.   Mr. Butler was thus denied a regular and clean supply of water at the Washington Hospital Center.

### B.   Lack of Food

19. Mr. Butler was frequently denied meals during his stay at the WHC.   When meals were delivered and placed on his bedside table, hospital personnel did not always provide the required assistance to ensure that Mr. Butler was fed.   On these occasions, his meals would sit for hours next to him, but would be beyond his reach.

20. It is particularly important for a burn victim to consume specific quantities of calories and proteins in regular meals to enable proper recovery; yet Mr. Butler was frequently denied meals due to his disability.

### C.   Lack of Regular Turning

21. When Mr. Butler is confined to a bed for long periods of time, he must be turned every two to three hours, or he becomes prone to bedsores. During Mr. Butler's stay at the WHC, hospital staff consistently failed to turn Mr. Butler with sufficient frequency.

22. Mr. Butler requested more frequent turning most of the days of his hospitalization. However, these requests were often denied: either a nurse would say she needed assistance to do it and would leave and not return, or hospital staff would explain that Mr. Butler could only be turned if there was an aide available to do so, and that they did not have sufficient aides available to meet his needs.

23. Due to the lack of regular turning, Mr. Butler's left hip became inflamed.

### D.   WHC's Refusal to Participate in Mr. Butler's Required Bowel Program

24. Individuals who are quadriplegic or who have suffered certain types of debilitating spinal cord injuries must develop and continually maintain what is known as a "bowel program." A spinal cord injury, such as Mr. Butler's, causes a total loss of control over the muscles that control the bowels and bowel movements. Therefore, without assistance, individuals such as Mr. Butler will become severely constipated and will suffer "impacted" bowels. This impaction can lead to dangerously high blood pressure, autonomic dysreflexia, and even stroke.

25. Maintenance of a bowel program, which usually involves a regimented combination of laxatives, enemas, manual stimulation, special diet, and regular mealtimes, will prevent bowel impaction and alleviate the risk of high blood pressure, autonomic dysreflexia, and stroke.

26. Bowel programs are necessarily individualized; different treatment combinations will be effective for different individuals. An effective bowel program, such as Mr. Butler's, can take years to develop, and a failure to comply with the program can disrupt the program for weeks or months.

6

27. The requirements of Mr. Butler's bowel program are as follows: The bowel program is performed every Monday, Wednesday, and Friday. Mr. Butler is given a suppository, followed by a wait of approximately 30 minutes on a toilet or commode chair, followed by approximately 15-20 minutes of intermittent manual stimulation. Thus, the total time for this entire bowel program (including suppository, wait time, and stimulation time) is typically between 45 minutes and 1 hour. However, in extreme or difficult cases (which occur rarely), the entire bowel program may take up to 1 ½ to 2 hours.

28. When Mr. Butler was admitted, he requested that the nurses and hospital staff assist him with his bowel program. He explained the requirements of the bowel program, as detailed in the above paragraph. WHC staff interpreted his explanation as a requirement of 1 ½ to 2 hours manual stimulation and refused to perform the bowel program on the ground that this amount of time was excessive and on the ground that the unit was not prepared to participate in bowel programs. One doctor stated that this was a burn unit, the staff was busy, they had dressings to change, and they did not have the time or the inclination to participate in a bowel program. Mr. Butler tried on several occasions to correct WHC staff's interpretation of his bowel program requirements, and to explain that he only required 15-20 minutes intermittent stimulation following a suppository and a 30-minute wait; however, WHC staff persisted in the erroneous belief that Mr. Butler was seeking 1 ½ to 2 hours stimulation. Plaintiff Rosemary Ciotti, who is a friend of Mr. Butler's and who visited him frequently during his stay at WHC, also attempted to correct these impressions of WHC staff, with little or no success.

29. As explained above, Mr. Butler's bowel program requires access to a commode chair or toilet, where he must sit after receiving the suppository; his program cannot be effective if he is always lying down. However, Mr. Butler was denied an accessible commode chair or toilet.

30. Although WHC staff initiated some attempts to participate in Mr. Butler's bowel program, all but one were abandoned. Instead, WHC staff merely offered Mr. Butler laxatives and enemas. Mr. Butler refused these proffered treatments on several occasions because he knew from experience that these medications would not have the desired effect absent

7

compliance with the full bowel program. On the occasions when Mr. Butler did accept these medications, WHC staff did not monitor their effects. As a result, on at least one occasion, Mr. Butler was forced to lie in feces for at least an hour.

31. While at WHC, Mr. Butler suffered high blood pressure and at least one instance of autonomic dysreflexia.

### E.     Lack of Communication

32. WHC's failure to provide adequate food, water, turning, and participation in Mr. Butler's bowel program had the potential to lead to serious health problems – yet Mr. Butler had no means of calling a nurse for help in case an emergency arose. Initially, Mr. Butler asked for but did not receive a mouth-operated call button. Such call buttons were available at the hospital, yet Mr. Butler did not receive one until approximately halfway through his inpatient stay. When he did receive an accessible call button, it was frequently kept out of his reach, several inches from his face. Therefore, during the majority of his stay at WHC, Mr. Butler did not have the ability to call for help.

33. Mr. Butler was also denied the ability to contact anyone outside the hospital. Initially, Mr. Butler did not have an accessible phone that would allow him to make phone calls to locations outside the hospital. He did eventually receive a phone that was accessible, in theory, to quadriplegics; however, this phone had to be programmed before it could be used. Neither Mr. Butler nor any of the nurses or staff knew how to program the phone so that Mr. Butler could use it independently. He could only use the phone when another person was present to assist him. As a result, Mr. Butler was denied an independent means of communicating with the outside world for the two weeks he was an inpatient at WHC.

## II.     Rosemary Ciotti

34. Rosemary Ciotti is a resident of Arlington, Virginia, and uses a wheelchair for mobility due to lupus and resulting neurological dysfunction. Ms. Ciotti is a clinical nurse practitioner specializing in the care of patients with disabilities. Ms. Ciotti has been diagnosed and treated for thyroid cancer, unrelated to her disability. Ms. Ciotti visits, and will continue to visit, WHC on a regular basis. She must receive yearly screenings as a follow-up to her thyroid operations at WHC.

35. Ms. Ciotti was hospitalized twice in February, 2002, at WHC: once for removal of a thyroid tumor, and again for removal of a portion of her thyroid. After her discharge from WHC, Ms. Ciotti received an examination on February 26, 2002 at WHC. She also received radiology treatment at WHC in April, 2002, and returned for laboratory tests in November, 2002 and March, 2003.

36. Over the course of these hospital stays and visits, Ms. Ciotti suffered the following barriers to accessibility of care:

### A.     Lack of Accessible Restrooms

37. Following each surgery, Ms. Ciotti was transferred to a bed in a wing of the hospital that was specially equipped to care for post-operative thyroid cancer patients. After Ms. Ciotti's first operation, she requested to be moved to her wheelchair so she could use the bathroom. Hospital personnel insisted that she should not get up and should use the bedpan instead, a practice which was extremely difficult due to Ms. Ciotti's limited use of her legs.

38. Before Ms. Ciotti's next operation, she requested a hospital room with an accessible bathroom. After this second operation, Ms. Ciotti again requested to be placed in her wheelchair and taken to the bathroom. Hospital personnel again requested that she use the bedpan instead. When Ms. Ciotti insisted on being taken to the bathroom, hospital staff admitted that there were no wheelchair accessible restrooms in the entire hospital wing.

9

39. Ms. Ciotti was informed that a wheelchair-accessible patient room and bathroom were available on a different floor and she was transferred there. However, the nurses and staff on Ms. Ciotti's new floor had no experience in caring for thyroid cancer patients, or post-operative cancer patients of any kind. As a result, Ms. Ciotti often received her antibiotics hours late. Thus, Ms. Ciotti had to choose between using the restroom or receiving necessary post-operative care, because no wheelchair-accessible restroom was available on the appropriate floor.

### *B.*    *Lack of Accessible Examination Tables*

40. Ms. Ciotti was discharged from WHC and went home on February 21, 2002, following her second thyroid surgery. However, by February 26, when she returned to the hospital for a follow-up examination, she was suffering stomach distress and vomiting. When she arrived, there were no accessible tables. As a result, doctor had to examine and palpate Ms. Ciotti's stomach while she was in her wheelchair.

41. The average examination tabletop does not lower to the level of the average wheelchair seat (if the table lowers at all). As a result, these examination tables are not accessible to patients in wheelchairs since the patients cannot be transferred to the tables without being lifted.

42. If no personnel are present who are physically able to lift the patient, the patient is denied access to the examining table altogether. If the personnel who attempt to lift the patient are untrained in lifting techniques, the transfer to the table is dangerous to the hospital staff and also dangerous and humiliating to the patient.

43. Tables that lower to the level of an average wheelchair seat are commercially available at a cost only slightly higher than that of a traditional examination table.

44. In cases where patients, such as Ms. Ciotti, are examined in their wheelchairs due to the lack of an accessible examination table, the quality of care and the results of the examination are compromised. Ms. Ciotti felt that her care was compromised because her abdomen could not

10

be properly accessed for examination and palpation while she was sitting in her chair.  Further, she felt humiliated by the procedure.

### C.    Lack of Accessible Lead-Lined Rooms and Showers for Radiology Treatment

45.  In April of 2002, Ms. Ciotti returned to WHC for radioactive iodine treatment. Following this treatment, although the patients themselves suffer no side effects, they emit doses of radiation from their bodies that can be transmitted to others.  Pregnant women and children are particularly vulnerable to the risks posed by exposure to patients who have just undergone radioactive iodine treatment.  Therefore, patients who have just undergone radioactive iodine therapy themselves become, in a sense, radioactive, and must be kept isolated for a time period commensurate with the size of the dose received.  WHC has several lead-lined rooms designated for the purpose of isolating such patients. The lead lining protects patients in adjoining rooms from the radiation, which travels through walls.  Patients must also shower (in a private shower located in the isolation room) to wash away the radiation that is emitted in the patient's sweat.

46.  The Nuclear Regulatory Commission has promulgated extensive regulations, located at 10 C.F.R. Parts 20 and 35, detailing the procedures that must be followed when radioactive medication is given to patients.  Pursuant to these regulations, hospitals including WHC have developed extensive procedures to ensure the safety of hospital personnel and other patients, and to facilitate the safe disposal of radiation through measures including repeated showering by the patient.

47.  Ms. Ciotti was scheduled to receive 100 millicuries of radioactive iodine, which is a large dose, and would subject her to the above regulations and to WHC's hospital policies and standard practices, which included isolation in one of the hospital's specially equipped lead-lined rooms, several showers per day, proper toilet hygiene, and thorough hand washing.  Having received detailed instructions from WHC personnel verbally and in writing regarding WHC policies for radioactive iodine treatment, Ms. Ciotti called the hospital before receiving this treatment to ask if a wheelchair-accessible lead-lined isolation room would be available for her.

11

She was assured that such a room was available.  She called repeatedly to confirm that the required a wheelchair-accessible lead-lined room would be provided.

48. When she arrived at WHC before her iodine treatment, Ms. Ciotti reminded personnel in the nuclear medicine department that she required a wheelchair-accessible lead-lined room. She was told that the existing rooms were "probably" accessible. Ms. Ciotti insisted that she ensure accessibility before her treatment, so she and a member of WHC staff went to the rooms. They discovered that none of the lead-lined rooms were wheelchair accessible.

49. Ms. Ciotti and the WHC staff member searched the hospital for hours for an accessible room that would ensure the safety of other patients. At one point, the staff member sought to place Ms. Ciotti in a room in the maternity ward. Ms. Ciotti refused, citing the enhanced danger of radiation from iodine therapy to children and pregnant women.

50. Hospital personnel also suggested placing Ms. Ciotti in a room with an inaccessible shower, sink and toilet, and having her use a commode chair, and forego showering and hand-washing. Ms. Ciotti again refused, noting that WHC personnel had previously informed her that showering, good toilet hygiene, and thorough hand washing are mandatory because these are the principal means by which the dangerous radiation is eliminated from the body.

51. Hospital personnel in the Nuclear Medicine department contacted the relevant regulators to determine the proper safety procedures when no lead-lined rooms were accessible.   It was determined that absent a lead-lined room, such safety could best be accomplished by placing Ms. Ciotti in a room with vacant adjoining rooms on each side.

52. Hospital personnel did not make these arrangements immediately, however, but instead attempted to arrange Ms. Ciotti's stay in a room which had a vacant room on one side, and an occupied room on the other side, by installing lead paneling on the occupied side. However, Ms. Ciotti pointed out that the lead panels were located behind the bed and were in a position that would block signals from her call button, and could interfere with the machinery in the room.  Hospital personnel agreed, and eventually did provide Ms. Ciotti with a room that had vacant rooms on either side.

12

### III.   George Aguehounde

53. George Aguehounde is a resident of Washington, D.C., and due to a spinal cord injury, uses a wheelchair for mobility. Mr. Aguehounde receives his regular checkups from his primary care physician, Dr. Emmanuel T. Mbualungu, who practices at the WHC Physician's Offices at 106 Irving Street. He also receives care from specialists at both the WHC hospital and the physician's offices, including regular six-month visits to the radiology department at WHC for sonograms and/or x-rays of his bladder and kidney. Mr. Aguehounde intends to continue to utilize the medical services of Dr. Mbualungu and specialists at WHC and the WHC Physician's Offices and is apprehensive that WHC will continue to discriminate against him on the basis of his disability.

54. In 2002, Dr. Mbualungu referred Mr. Aguehounde to the radiology department at the WHC Physician's Offices for a sonogram. On December 12, 2002, Mr. Aguehounde went to the WHC radiology department for this test. The examination table at the radiology department was not accessible. The nurse told Mr. Aguehounde that she preferred to examine patients on the examination table, because she can perform the sonogram better when the patient is lying flat on a table. Despite her preference for a table, the nurse performed the sonogram while Mr. Aguehounde was in his wheelchair. This was uncomfortable and humiliating for Mr. Aguehounde.

55. Dr. Chang, the urologist in charge of examining the resulting film, stated that the nurse was wrong to have performed Mr. Aguehounde's sonogram while he was in his chair, because results cannot be sufficiently clear unless the patient is lying flat. Since Mr. Aguehounde was denied access to an examination table, he received a lesser quality of care at WHC than other patients because of his disability.

56. On November 3, 2003, Mr. Aguehounde returned to the WHC radiology department to receive another sonogram. The same nurse conducted the sonogram again while Mr. Aguehounde was seated in his wheelchair even though Mr. Aguehounde requested that the sonogram be performed on the examination table. The nurse refused, stating that it would be

13

very hard to get Mr. Aguehounde onto the table because all other WHC staff was occupied. On that same day, Mr. Aguehounde also had "KUB" x-rays (kidney, urethra, and bladder) taken at the radiology department at WHC. For this procedure, Mr. Aguehounde *was* lifted onto the x-ray table by two staff members. However, Mr. Aguehounde observed that the attendants lifted him in an improper manner, with one nurse grabbing his legs and another grabbing his upper body. Based on these repeated incidents of discrimination, there is a substantial likelihood that Mr. Aguehounde will suffer similar discrimination during his future visits to WHC.

### IV.    Marsha Johnson

57.  Marsha Johnson is a resident of Silver Spring, Maryland, and uses a wheelchair due to a childhood case of polio, and post-polio symptoms. Ms. Johnson's general practitioner, Dr. Wade, practices at WHC. Ms. Johnson has also received annual gynecological examinations at WHC.

58.  During her examinations at WHC, Ms. Johnson has never been provided with an accessible examination table. The examination tables Ms. Johnson has used at the WHC gynecological clinic do not lower at all, and Ms. Johnson has to be lifted onto the table by attendants.

59.  Ms. Johnson suffers from osteoporosis, and a resultant increased risk of breaking bones in a fall. For this reason, each time Ms. Johnson is lifted, she experiences substantial fears of being dropped and suffering a debilitating injury, particularly given Ms. Johnson's observation that the lifting attendants do not lift her capably or competently. Further, Ms. Johnson suffers humiliation when she is lifted while she is disrobed, which has occurred on previous visits; this humiliation is exacerbated when the lifting attendants are male.

60.  Ms. Johnson's most recent gynecological examination was on May 2, 2003. She arranged the appointment two weeks in advance and notified the hospital that she used a wheelchair. She arrived for her scheduled appointment early. She was informed that there was

14

an accessible table, but that she would have to wait for it. No further explanation was given. After waiting four hours, Ms. Johnson insisted that she be examined right away. The doctor and staff did not mention the accessible table again and lifted her onto the inaccessible table to examine her. Ms. Johnson never saw the accessible table to which hospital staff had initially referred.

61. Ms. Johnson also receives periodic examinations at WHC, due to her previous surgery, and may continue to do so in the future. However, the examination tables are not adjustable, and no one is available to lift her onto them. Therefore, at these examinations the doctor examines her stomach while she is in her wheelchair. This examination in a sitting position precludes a complete examination of Ms. Johnson's abdominal area. The lack of an accessible examination tabled has therefore caused Ms. Johnson to receive lower-quality health care than a non-disabled patient.

### V.  Disability Rights Council of Greater Washington

62. Defendant's discriminatory conduct has directly injured the Disability Rights Council by: (a) frustrating the Disability Rights Council's organizational mission of promoting equal access to facilities and services for disabled persons and eliminating discrimination against such persons in public accommodations in the greater Washington, D.C. metropolitan area; (b) causing the Disability Rights Council to devote scarce resources to identifying and attempting to remedy Defendant's unlawful discriminatory practices; and (c) interfering with the interests of the Disability Rights Council and its members in protecting their rights and the rights of all residents of the greater Washington, D.C. metropolitan area to live and work in a community that is free from illegal discrimination.

63. Plaintiffs have no plain, adequate or complete remedy at law. They have suffered, are suffering, and will continue to suffer irreparable injury because of discriminatory policies, practices, and actions of Defendant.

## CAUSES OF ACTION

### Count I

### (The Americans With Disabilities Act)

64. Plaintiffs incorporate and allege each of the allegations set forth in paragraphs 1-63 above.

65. At all times relevant to this action, the Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq. (Supp. V 1993) (the "ADA"), and the regulations promulgated under Title III of that Act, 28 C.F.R. 36, were in full force and effect in the United States of America and applied to Defendant Washington Hospital Center, its facilities and offices, including the adjacent Physician's Office building.

66. The ADA was enacted as part of a national effort to combat discrimination by public and private entities on the basis of disability. Title III of the ADA ("Title III") expressly prohibits, among other things, discrimination on the basis of disability in full and equal enjoyment of the goods, services, facilities, privileges, advantages or accommodations in any place of public accommodation operated by a private entity.

67. Defendant owns and operates health care facilities including a hospital and physicians' offices, and therefore owns and operates a place of public accommodation within the meaning of the ADA.

68. At all times relevant to this action, each individual Plaintiff suffered from a physical disability that substantially limited one or more of his or her major life activities; each individual Plaintiff must use a wheelchair for mobility.

69. Defendant WHC has deprived Plaintiffs of the full and equal enjoyment of and access to their health care facilities, and health care services, in violation of the ADA.

70. Defendant WHC has failed to remove architectural barriers to access. 42 U.S.C. § 12182(b)(2)(A)(iv) and 28 C.F.R. § 36.304 require that places of public accommodation remove architectural barriers to access for disabled persons, so long as such removal is "readily achievable." 42 U.S.C. §12181(9) and 28 C.F.R. § 36.304 define "readily achievable" as "easily

16

accomplishable and able to be carried out without much difficulty or expense." By failing to provide Plaintiffs Rosemary Ciotti and Christopher Butler accessible restrooms, and by failing to provide Ms. Ciotti with an accessible lead-lined room with shower on the floor of the hospital equipped to care for post-radiation therapy thyroid patients, WHC violated the requirements of the ADA and its corresponding regulations.

71. The purpose and primary benefit to patients of hospital visits and stays is to obtain medical care that will promote and improve their health. When a hospital denies patients with disabilities services necessary to their continued good health, disabled patients cannot be said to have the same "opportunity... to participate in or benefit from the goods, services, facilities, privileges, advantages or accommodations" of the hospital, as is their right under the ADA. The statute and the Department of Justice regulations, at 42 U.S.C. § 12182(b)(1)(A)(ii) and 28 C.F.R. 36.203, prohibit that public accommodations from providing disabled individuals services that are "not equal" to those provided to non-disabled individuals. WHC has denied disabled Plaintiffs, DRC members, and other patients with disabilities, the full and equal benefits of its services.

72. WHC denied Christopher Butler equal benefits and services by failing to provide him with a regular supply of water, by failing to ensure that he received regular meals, by failing to provide him with the means to summon assistance or to place telephone calls, by failing to turn him regularly, and by failing to participate in his bowel program. These services were necessary to Mr. Butler's continued good health; yet Defendant health care facility did not provide those services because doctors and staff "did not have time" to care for a special-needs patient, and because they expressed that providing such necessary health services were not part of their job responsibilities. Through their inaction, hospital staff not only failed to afford Mr. Butler the same opportunities for wellness as their non-disabled patients; but actively placed Mr. Butler in a dangerous and life-threatening situation.

73. WHC denied Marsha Johnson, Rosemary Ciotti, and George Aguehounde equal benefits and services of medical care by failing to provide them with wheelchair-accessible

17

examination tables, because examination tables are readily available to non-disabled patients. Examination and testing in a wheelchair are not equal to an examination on a table, because certain areas of the body are less accessible to the doctor when the patient is in a sitting position. Examination in a chair was uncomfortable and humiliating for Plaintiffs, and is not the equivalent of an examination on a table.  Provision of wheelchair-accessible tables is required in order for disabled patients to receive services "equal" to non-disabled patients.

74. Defendant WHC also violated its responsibility to reasonably modify its policies, practices and procedures as required by 42 U.S.C. § 12182(b)(2)(A)(ii) and 28 C.F.R. §35.302(a), and its responsibility to provide auxiliary aids for communication as required by 28 C.F.R. § 36.303(c), when it initially failed to provide, and subsequently failed to program, the accessible phone for Mr. Butler, cutting him off from communication with others outside the hospital, and when it delayed in providing Plaintiff Christopher Butler with a mouth-operated call button, and when it then kept the call button out of Mr. Butler's reach for the majority of his stay.

75. Defendants knowingly, deliberately and intentionally violated the Americans with Disabilities Act by failing to provide accessible facilities and adequate health services to Plaintiffs, and by refusing reasonable requests for accommodation and accessible facilities.

76. Plaintiffs seek an injunction requiring Defendant to provide full and equal accommodations, advantages and facilities at Washington Hospital Center.  Plaintiffs have no plain, adequate or complete remedy at law in this regard, and have suffered, are suffering and will continue to suffer irreparable injury because of Defendant's discriminatory policies, practices, and actions.  Plaintiffs also seek, pursuant to the ADA, costs and reasonable attorney's fees incurred in the prosecution of this action.

## Count II

### (Section 504 of the Rehabilitation Act of 1973)

77. Plaintiffs incorporate and allege each of the allegations set forth in paragraphs 1-76 above.

78. At all times relevant to this action, Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, was in full force and effect and applied to Defendant Washington Hospital Center, its facilities and offices.

79. Section 504 of the Rehabilitation Act of 1973, which was enacted before the ADA but operates in tandem with the ADA, provides for injunctive relief and the recovery of damages by persons who have suffered discrimination on the basis of a disability by any entities which receive federal financial assistance.

80. At all times relevant to this action, individual Plaintiffs suffered one or more physical impairments that substantially limited one or more of his or her major life activities; each individual Plaintiff must use a wheelchair for mobility.

81. Defendant WHC receives federal financial assistance through Medicare and Medicaid payments, and therefore is an entity receiving federal assistance under the Rehabilitation Act, and is subject to the Act's provisions.

82. Each individual Plaintiff was fully eligible and otherwise qualified to receive the types of medical care sought from WHC.

83. Each individual Plaintiff was denied the full and equal benefits of health care at WHC and was discriminated against on account of his or her disability, as detailed above. Defendant's past and ongoing violations of Section 504 have directly injured, and continue to injure, each individual Plaintiff by preventing them from receiving and enjoying the same quality of health care as the hospital's non-disabled patients.  Plaintiffs continue to be injured by Defendant's denial of equal health care.  Plaintiffs have no plain, adequate or complete remedy at law in this regard, and have suffered, are suffering and will continue to suffer irreparable injury because of Defendant's discriminatory policies, practices, and actions.  Plaintiffs therefore

seek an injunction requiring Defendant to provide full and equal accommodations, advantages and facilities at Washington Hospital Center. Further, each Plaintiff is entitled to compensatory damages under Section 504 of the Rehabilitation Act, and the DRC is also entitled to compensatory damages under Section 504 for its efforts on behalf of each individual Plaintiff, for the frustration of its mission, and for the diversion of its resources.

## Count III

### (The District of Columbia Human Rights Act)

84. Plaintiffs incorporate and allege each of the allegations set forth in paragraphs 1-83 above.

85. At all times relevant to this action, the District of Columbia Human Rights Act, D.C. Code Ann. §§ 2-1401.01 et seq. (2001) (the "DCHRA") and the guidelines promulgated by the District of Columbia Commission on Human Rights were in full force and effect in the District of Columbia and applied to Defendant's conduct and that of its Washington, D.C. hospital and physician's offices.

86. The DCHRA, at § 2-1402.31, prohibits discrimination against persons with a disability and requires that all persons with a disability have full and equal enjoyment of the goods, services, facilities, privileges, advantages and accommodations of any place of public accommodation.

87. At all times relevant to this action, Ms. Johnson and Mr. Aguehounde had a significant physical impairment that substantially limited one or more of his or her major life activities.

88. Defendant is a health care facility which includes a hospital and physicians' offices, and therefore owns and operates a place of public accommodation within the meaning of the DCHRA.

89. Defendant has discriminated against Ms. Johnson and Mr. Aguehounde on the basis of their disabilities by failing to provide full and equal access to facilities and equipment including examination tables, and by failing to provide full and equal access to health care.

90. Plaintiffs Marsha Johnson, George Aguehounde, and the DRC have no plain, adequate or complete remedy at law in this regard, and have suffered, are suffering and will continue to suffer irreparable injury because of Defendant's discriminatory policies, practices, and actions. Plaintiffs therefore seek an injunction requiring Defendant to provide full and equal accommodations, advantages and facilities at Washington Hospital Center.

91. Defendant's past and ongoing violations of the DCHRA have directly injured, and continue to injure, Ms. Johnson and Mr. Aguehounde by preventing them from receiving and enjoying the same quality of health care as the hospital's non-disabled patients. Plaintiffs Marsha Johnson and George Aguehounde continue to be injured by Defendant's denial of equal health care. Ms. Johnson and Mr. Aguehounde are therefore, entitled to compensatory damages under the DCHRA, and the DRC is also entitled to compensatory damages under the DCHRA.

92. Ms. Johnson, Mr. Aguehounde, and the DRC seek punitive and/or exemplary damages under the DCHRA to sanction Defendant for the systematic and reckless disregard for their statutory rights; for its policy, pattern and practice of discrimination against all individuals using wheelchairs in the greater Washington, D.C. metropolitan area; and, to deter Defendant, its agents, and other owners and operators of public accommodations from pursuing such policies or practices in the future.

### PRAYER FOR RELIEF

Plaintiffs pray that this Court:

(1) enter judgment declaring that Defendant Washington Hospital Center has violated the Americans With Disabilities Act;

(2) enter judgment declaring that Defendant Washington Hospital Center has violated Section 504 of the Rehabilitation Act of 1973;

(3) enter judgment declaring that Defendant Washington Hospital Center has violated the District of Columbia Human Rights Act;

(4) enter judgment declaring that Defendant Washington Hospital Center engaged in a pattern and practice of discrimination against persons with disabilities;

(5) enter judgment for appropriate injunctive relief ordering Defendant to (a) cease violating the Americans With Disabilities Act; (b) cease violating the Rehabilitation Act of 1973; (c) cease violating the District of Columbia Human Rights Act; and (d) bring its equipment, facilities, policies and practices into compliance with all three Acts;

(6) enter judgment awarding each Plaintiff compensatory damages under Section 504 in an amount appropriate to the proof at trial;

(7) enter judgment awarding Plaintiffs Marsha Johnson, George Aguehounde, and the DRC compensatory damages under the DCHRA in an amount appropriate to the proof at trial;

(8) enter judgment awarding Plaintiffs Marsha Johnson, George Aguehounde, and the DRC punitive and/or exemplary damages under the DCHRA in an amount appropriate to the proof at trial;

(9) grant Plaintiffs their costs and reasonable attorney's fees incurred in the prosecution of this action; and

10) grant such other relief as this Court deems just and proper.

Respectfully submitted,

Robert H. Cox (D.C. Bar No. 432945)
Jennifer R. Bagosy (D.C. Bar No. 483718)
HOWREY, SIMON, ARNOLD & WHITE, LLP
1299 Pennsylvania Ave., N.W.
Washington, D.C. 20004
(202) 783-0800 (Tel.)
(202) 383-6610 (Fax)


Elaine Gardner (D.C. Bar No. 271262)
WASHINGTON LAWYERS' COMMITTEE FOR
CIVIL RIGHTS AN URBAN AFFAIRS
11 Dupont Circle, N.W., Suite 400
Washington, D.C. 20036
(202) 319-1000 (Tel.)
(202) 319-1010 (Fax)

Attorneys for Plaintiffs

Dated: _____, 2004

23